IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TILLMAN T. HENDERSON,<br><br>　　　　　　Petitioner,<br><br>　vs.<br><br>SCOTT   FRAKES,   and   MICHELLE CAPPS,<br><br>　　　　　　Respondents. | **4:19CV3022**<br><br><br>**MEMORANDUM<br>AND ORDER** |

This matter is before the court on Petitioner Tillman T. Henderson's ("Petitioner" or "Henderson") Petition for Writ of Habeas Corpus. (Filing No. 1.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed,[1] and as set forth in the court's prior progression order (filing no. 10), Petitioner asserted the following claims that were potentially cognizable in this court:

Claim One:　　　Petitioner was denied effective assistance of counsel *because* trial counsel **(1)** failed to raise and argue Petitioner's actual innocence (filing no. 1 at CM/ECF p. 19); **(2)** failed to move to compel DNA and GSR testing (*id*. at CM/ECF pp. 19–20, 47–49); **(3)** failed to interview

---

[1] Petitioner did not object to the court's summary and condensation.

or call witnesses Joeanna Ball, Deonta[2] Marion, and Timothy Washington to testify (*id.* at CM/ECF pp. 20–23); **(4)** failed to request an instruction on a co-conspirator rule and its application to hearsay exceptions (*id.* at CM/ECF p. 44); **(5)** failed to object to Ramone Navarez's testimony based on irrelevance until after his testimony was complete (*id.* at CM/ECF pp. 52–53); **(6)** failed to impeach Officer Sarka's testimony, to introduce audio and video evidence from Sarka's cruiser to the jury, and to move to strike the portion of Sarka's testimony "identifying the defendant as the shooter from what someone else told him" (*id.* at CM/ECF pp. 56–57).

Claim Two:    Petitioner was denied effective assistance of counsel *because* trial and appellate counsel **(1)** failed to argue *State v. Tompkins* which is based off *U.S. v. Hahn* against the State raising the good faith exception for the first time on appeal (*id.* at CM/ECF pp. 24–25); **(2)** failed to assign error to the trial court's refusal to give a limiting instruction regarding the cell phone text messages (*id.* at CM/ECF p. 28); **(3)** failed to object or assign error to photos of an individual believed to be Jimmy Levering flashing gang signs being shown to the jury (*id.* at CM/ECF pp. 30–31); **(4)** failed to object or assign error to the State showing the jury a photo of a coat worn by Petitioner the night of his arrest and saying the coat had bloodstains on it (*id.* at CM/ECF pp. 60–61); and **(5)** failed to request an attempted manslaughter instruction or assign

---

[2] The court has corrected the spelling of Marion's first name throughout this Memorandum and Order.

error to the instruction not being given (*id*. at CM/ECF pp. 64–65).

Claim Three:    Petitioner was denied his constitutional right to a fair trial *because* **(1)** the State committed prosecutorial misconduct by its use of the "J-town" text messages (*id*. at CM/ECF pp. 26–27); **(2)** the trial court refused to give a limiting instruction regarding the cell phone text messages (*id*. at CM/ECF p. 29); **(3)** the trial court denied Petitioner's motion for a mistrial after Detective Nick Herfordt identified a photo found on the cellular phone in Petitioner's possession at the time of his arrest as Jimmy Levering "an infamous gang member" (*id*. at CM/ECF pp. 34–36); **(4)** the trial court erred in admitting the cell phone text messages because such evidence was inadmissible hearsay (*id*. at CM/ECF at pp. 39–40); **(5)** the trial court erred in admitting the cell phone text messages as statements of a co-conspirator (*id*. at CM/ECF pp. 43–44); and **(6)** the trial court failed to instruct the jury on a co-conspirator rule and its application to hearsay exceptions (*id*. at CM/ECF p. 44).

## II.  BACKGROUND

**A.  Convictions and Sentences**

The court states the facts as they were recited by the Nebraska Supreme Court in *State v. Henderson*, 854 N.W.2d 616 (Neb. 2014) (filing no. 14-1). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

## 1. Charges and General Evidence

Henderson was convicted of first degree murder in connection with the shooting death of Matthew Voss and attempted first degree murder in connection with the shooting of Antonio Washington. He was convicted of two counts of use of a deadly weapon to commit a felony in connection with the foregoing crimes. He was also convicted of possession of a deadly weapon by a prohibited person.

Testimony at trial indicated that in the early morning hours of February 18, 2012, a fight broke out at an after-hours party in downtown Omaha, Nebraska. Witnesses reported seeing two men firing guns. Voss and Washington both sustained gunshot wounds; Voss died as a result of his wounds, while Washington survived but was severely injured.

Henderson was apprehended by police as he was running from the scene of the incident. A person who was at the scene had identified Henderson to a police officer as one of the shooters. The other suspect was not apprehended. One gun was found on Henderson's person when he was arrested, and a police officer saw Henderson throw another gun under a vehicle as the officer was chasing him.

Forensic evidence presented at trial indicated that bullets and casings found at the scene of the shootings had been fired from the gun found on Henderson and from the gun he was seen throwing under a vehicle. A fingerprint on the gun found under the vehicle matched Henderson's. In addition, DNA testing of blood found on the clothing worn by Henderson at the time of his arrest indicated that the blood had come from Voss.

The State maintained at trial that Henderson shot Voss and Washington to retaliate for an assault on Henderson's friend, Jimmy Levering. Levering and Voss had both been inmates at a prison in Florida, and Voss had allegedly stabbed and punched Levering.

## 2. Apprehension of Henderson

Omaha police officer Paul Sarka responded to a call regarding a fight or disturbance in the area of 16th and Harney Streets around 3 a.m. on February 18, 2012. Sarka saw a group of people outside a building in the area, but he did not see a disturbance. He circled the block and then pulled his police cruiser into an alley to park and write a report on his response to the call. Soon after parking, Sarka heard several gunshots. He pulled his cruiser out of the alley and, with the lights and sirens turned on, drove in the direction from which he thought he had heard the gunshots, which direction was toward the group of people he had seen near 16th and Harney Streets. As he drove, he radioed a message to dispatch saying, "'Shots were fired. Send more officers.'"

Sarka saw 20 to 30 people running from the scene screaming and looking like they were in fear. Sarka yelled out of his cruiser's window to the people asking them who had done the shooting, but he did not get a response. The driver of a white sport utility vehicle rolled down his window, and when Sarka asked whether the driver had seen who did the shooting, the driver replied that it was "'the black male running down the sidewalk of this side of the street in the tan Carhartt.'" Sarka saw only one man in the group of people running on the sidewalk who was wearing a tan Carhartt jacket; the man was later identified as Henderson.

Sarka yelled at Henderson, "'Police, stop.'" Henderson made eye contact with Sarka but then turned and continued running. Sarka chased Henderson, first in his cruiser and then on foot. As Sarka was chasing Henderson on foot, another police cruiser came toward Henderson which caused him to change direction. Sarka saw Henderson pull an object that looked like a gun out of his waistband or pocket and throw the object under a vehicle that was parked on the street. Sarka continued to chase Henderson and was joined by another officer. The two eventually tackled Henderson and handcuffed him. Sarka turned Henderson over to another officer, Fred Hiykel. Sarka returned to the place where he had seen Henderson throw the object under a vehicle. The object proved to be a gun.

5

Hiykel responded to Sarka's "'Shots were fired'" call and arrived just as Sarka took Henderson into custody. Hiykel escorted Henderson to his police cruiser. Hiykel searched Henderson and found a handgun in his pocket. He removed the gun and put it in a plastic evidence bag. Hiykel put Henderson into the back of his cruiser and drove him to police headquarters. In the interview room, Hiykel removed other personal property from Henderson's person and placed the property in an evidence bag.

### 3. Search of Cell Phone

Dave Schneider was one of the homicide detectives from the Omaha Police Department (OPD) assigned to investigate the shootings. One of Schneider's duties was to obtain a search warrant for a cell phone that was among the items of personal property taken from Henderson upon his arrest. Schneider himself had not come into contact with the cell phone, but he knew that other officers had turned the cell phone on to obtain its serial number and telephone number. Schneider testified that the other officers had placed the cell phone into "airplane mode" so that the cell phone could not be remotely accessed for the purpose of deleting data. Schneider prepared an affidavit and application for issuance of a warrant to search the contents of the cell phone. In the affidavit and application, Schneider generally requested a warrant to search "[a]ny and all information" contained on the cell phone. He specifically listed contacts, cell phone call lists, text messages, and voice mails, and he also requested "any other information that can be gained from the internal components and/or memory Cards." As grounds for the issuance of the warrant, Schneider asserted that Henderson was a suspect in a shooting and that the cell phone was in Henderson's possession when he was arrested. The county court for Douglas County issued the requested search warrant on February 18, 2012.

The search of the cell phone was conducted by another detective, Nick Herfordt, during the afternoon of February 18, 2012. Herfordt downloaded information from the cell phone, including the contact list, call history, and text messages. Included in the information downloaded was a series of text messages

6

exchanged between the cell phone and another number between 2:34 a.m. and 3:11
a.m. on February 18. Messages coming from the other number included two which
stated, "That Nigga that stab Jb up here" and "After hour on harney downtown."
Messages sent from the searched cell phone included two which stated, "On my way
keep close eye" and "Im out side wat up?" Other messages appear to indicate that
the two persons exchanging the messages were attempting to meet up with one
another outside the location mentioned in earlier messages. Herfordt also found a
picture that was used as "wallpaper," or the background on the cell phone's screen.
The picture depicted a man, and at trial, witnesses identified the man in the picture
as Levering.

Prior to trial, on June 13, 2012, Henderson filed a motion to suppress evidence
obtained from the search of the cell phone. He asserted, inter alia, that the affidavit
supporting the request for the search warrant "did not contain sufficient information
to establish probable cause to believe a crime or evidence of a crime would be found
on [Henderson's] cellular telephone." The district court held a hearing on the motion
to suppress on August 16. However, before the court ruled on the motion to suppress,
Schneider obtained a second warrant to search the cell phone.

The affidavit Schneider submitted to the county court in support of the second
warrant included the same information that had been included in the request for the
first warrant, but there was additional language stating:

> In Affiant Officers [sic] experience and training as a detective it is
> known that suspects that we have had contact with use cell phones to
> communicate about shootings that they have been involved it [sic],
> before, during, and afterwards. The communication can be though [sic]
> voice, text, and social media, to name a few.

The county court issued a second search warrant based on the new affidavit
on September 14. On September 20, Herfordt searched the contents of the cell phone
a second time.

On November 13, 2012, Henderson filed a motion to suppress evidence obtained from the second search of the cell phone, and the district court held a hearing on the motion on November 19. The court entered an order on January 17, 2013, overruling Henderson's motion to suppress evidence obtained from the second search. The court agreed with Henderson's argument that the affidavit submitted in support of the first search warrant issued on February 18, 2012, did not sufficiently state why a search of the cell phone would produce evidence relevant to the crimes for which Henderson was arrested and that therefore, there was not probable cause to support the first search warrant. But the court continued that no warrant was necessary because, in its view, the search of the cell phone, which was found on Henderson at the time of his arrest, was a valid warrantless search incident to his arrest. The court stated that because no warrant was needed to conduct the search, issues regarding the validity of the second search warrant were moot.

Notwithstanding its conclusion that a warrant was not required, the district court addressed the warrant issue "in the event it is eventually determined that the Court is in error on that issue" regarding the need for a warrant. The court rejected Henderson's argument that the second warrant was an attempt to rehabilitate the deficiencies of the first warrant and that the second warrant was tainted by the execution of the first warrant. The court concluded that "there is little or no evidence that 'but for' the execution of the first search warrant the State would not have searched the cellular telephone using the properly issued second search warrant."

After Henderson filed a motion to reconsider the ruling on the motion to suppress, the court held another hearing focused on the validity of the second search warrant. On February 7, 2013, the court entered an order overruling the motion to reconsider and suppress evidence obtained from the second search. In the order, the court specifically determined that the affidavit offered in support of the second search warrant, which included the additional language quoted above, established probable cause to search the cell phone. The court concluded that the second search warrant was properly issued and executed.

### 4. Issues Prior to and During Trial

Prior to trial, OPD filed a motion for a protective order against a subpoena duces tecum that had been served by Henderson. The subpoena requested the keeper of OPD's records to appear at trial and provide a copy of gang files related to Henderson and to an individual known as JB. At a hearing on the motion, OPD argued that the files were confidential and subject to confidentiality restrictions imposed by OPD and the federal government. OPD further asserted that disclosure of such information could jeopardize its efforts in monitoring gang activity.

At the hearing on OPD's motion, the court also considered motions in limine Henderson had filed seeking to preclude the State from adducing evidence regarding gang affiliations. At this hearing, the State represented that it had not seen any of the OPD files and that it did not intend to introduce any evidence at trial regarding gang affiliation. The court granted OPD's motion for a protective order but indicated that it might change its ruling if at trial the State introduced evidence to establish that the "JB" referred to in the text message found on Henderson's cell phone was Levering and if such evidence was derived from information in the OPD gang files.

Herfordt testified at trial. When the State began to question Herfordt regarding his search of the cell phone and the evidence he obtained from the search, Henderson made a foundation objection that a proper chain of custody had not been established for the cell phone. The court initially sustained the foundation objection, and the State recalled Hiykel as a witness regarding the chain of custody. Hiykel testified generally that after Henderson's arrest, he took all items that Henderson had on his person and put them into an evidence bag; however, Hiykel did not specifically recall taking a cell phone. Herfordt then returned to the stand, and upon questioning by the State, identified the cell phone as the one that he booked into property in connection with the present case. When the State offered the cell phone into evidence, Henderson objected based on foundation and the court admitted the cell phone into evidence over the objection.

Henderson also renewed his objections that the evidence was obtained in violation of his Fourth Amendment rights against unreasonable searches. The court overruled the objections based on its prior alternative rulings that the search of the cell phone was valid as a warrantless search incident to Henderson's arrest, that the second search warrant was valid and supported by probable cause, and that the search conducted pursuant thereto was legal.

Herfordt testified regarding what he found in his search of the cell phone. He testified that the background picture that came up on the screen when the cell phone was turned on "was that of someone known to be Jimmy Levering." Henderson objected based on foundation, and the court sustained the objection. The State attempted to provide foundation by asking Herfordt how he knew the identity of the person in the picture. Herfordt replied, "I worked Northeast Omaha when I was in uniform, and Jimmy Levering, I guess, was kind of an infamous gang member. . . ." Henderson immediately moved for a mistrial based on Herfordt's reference to gang affiliations, noting that the State had agreed in connection with Henderson's pretrial motion in limine that it would not introduce evidence regarding gang affiliations. The court overruled the motion for a mistrial, and the State continued questioning Herfordt regarding how he knew the person in the picture was Levering. Herfordt testified that he had not had personal contact with Levering but had seen pictures of him in the course of previous investigations. The State offered the picture taken from the cell phone into evidence, and the court overruled Henderson's objections based on foundation and Fourth Amendment grounds.

Herfordt also testified regarding the text messages that he found on the cell phone. Henderson objected to evidence regarding text messages on the basis that the evidence was inadmissible hearsay. The State argued that the evidence was not being offered to prove the truth of the matter asserted but to show the effect the messages had on Henderson. The court overruled the hearsay objection.

The State also called Ramone Narvaez as a witness. Narvaez was a correctional officer from a federal penitentiary in Florida. Narvaez testified that in

10

December 2009, Levering, who was then an inmate at the penitentiary, ran into his office followed by three other inmates who started punching Levering. Narvaez testified that he and other officers broke up the fight and that Levering was taken to the medical unit because he was bleeding from his torso. Narvaez testified that the last name of one of the other inmates was "Voss" but that he did not know Voss' first name. Narvaez was shown the picture that was taken from the cell phone, and he testified that the person in the picture was the same person who had been involved in the incident in Florida.

After the cross-examination and redirect testimony of Narvaez were completed, Henderson moved for a mistrial or, in the alternative, for an order striking Narvaez' testimony on the basis that he was not able to establish that the "Voss" to whom he referred in his testimony was the "Matthew Voss" who was a victim in this case and that he had not testified that Levering was stabbed. Henderson argued that without establishing these facts, Narvaez' testimony was unfairly prejudicial. The court overruled the motion for a mistrial and the motion to strike the testimony.

The State also called Omaha Police Det. Christopher Perna as a witness. Perna was shown the picture from the cell phone, and he identified that person as Levering. Perna testified that he had personally interviewed Levering in the course of other investigations. Perna also testified that he had briefly interviewed a "Matthew Voss" on March 31, 2010, at a federal penitentiary in Florida and that Levering's name "came up" in the interview. Perna was shown a picture of the victim in this case, and Perna testified that the person in the picture was the "Matthew Voss" he had interviewed in Florida.

## 5. Convictions and Sentences

The jury found Henderson guilty of first degree murder, attempted first degree murder, two counts of use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. The court sentenced Henderson to imprisonment for life for first degree murder, for 50 to 50 years for attempted first

degree murder, for 20 to 20 years on each of the convictions for use of a deadly weapon, and for 20 to 20 years on the conviction for possession of a deadly weapon by a prohibited person. The court ordered the sentences to be served consecutively.

## B.  Direct Appeal

Henderson appealed his convictions and sentences to the Nebraska Supreme Court. Henderson was represented by the same counsel on appeal as at trial. In his brief, Henderson assigned that the state district court erred when it (1) overruled his motion to suppress evidence obtained from the search of the cell phone; (2) admitted evidence obtained from the allegedly illegal search of the cell phone, including text messages and pictures; (3) admitted evidence of items found on the cell phone over his foundation objections; (4) admitted evidence of text messages over his hearsay objections; (5) granted OPD's motion for a protective order relating to gang files; (6) denied Henderson's motion for a mistrial based on Herfordt's testimony that Levering was "an infamous gang member"; (7) denied his motion to strike Herfordt's testimony for lack of foundation identifying Levering as the person in the cell phone picture; and (8) overruled his motion for a mistrial and his motion to strike Narvaez' testimony. (Filing No. 14-1 at CM/ECF p. 10; Filing No. 14-5 at CM/ECF pp. 10-11.)

In a published opinion, the Nebraska Supreme Court affirmed Henderson's convictions and sentences. (Filing No. 14-1.) On June 15, 2015, the United States Supreme Court denied Henderson's petition for a writ of certiorari. *See Henderson v. Nebraska*, 135 S. Ct. 2845 (2015). (*See also* Filing No. 14-10; Filing No. 14-11.)

## C.  Postconviction Action

Henderson, through newly appointed counsel, filed an amended motion for postconviction relief on February 5, 2016. (Filing No. 14-17 at CM/ECF pp. 2-25.) Henderson alleged various instances of ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and trial court error. (*Id.* at CM/ECF pp. 2-16.)

Henderson alleged that he was denied effective assistance of counsel because trial counsel (1) failed to interview or call Timothy Washington, Deonta Marion, and Jermaine Westbrook as witnesses; (2) failed to move to compel testing of the DNA sample taken from Jeremy Terrell; (3) failed to move to compel testing of the gunshot residue swabs taken from Kevin Washington, James Garrett, Antonio Washington, and Matthew Voss; (4) allowed prejudicial gang evidence to be introduced at trial; (5) failed to object on authentication grounds to the admission of "J Town" text messages obtained from Henderson's cell phone; (6) failed to properly brief the trial court concerning the "J Town" text messages before a suppression hearing on the second search warrant; (7) failed to object to the search of Henderson's cell phone on Fourth Amendment grounds; (8) failed to object on relevancy grounds to Narvaez's testimony until after Narvaez's testimony was complete; (9) failed to request lesser-included offenses for the charge of attempted first degree murder; (10) failed to object on authentication and prejudice grounds to the admission of the Carhartt coat allegedly worn by Henderson on the night of the shooting; (11) failed to pursue claims of witness tampering by Antonio Washington; (12) misstated the testimony of Vasili Petrihos; and (13) failed to obtain impeachment evidence from the OPD. (*Id.* at CM/ECF pp. 6-17.)

Henderson alleged that appellate counsel was ineffective for failing to raise on direct appeal the above issues, excluding the issues in (1) and (4). (*Id.*) In addition, Henderson alleged that appellate counsel was ineffective for failing to raise on direct appeal that (1) the trial court erred in rejecting his limiting instruction regarding the "J Town" text messages (*id.* at CM/ECF p. 10); and (2) the opinion in *State v. Tompkins*, 723 N.W.2d 344 (Neb. 2006), *modified on denial of rehearing*, 727 N.W.2d 423 (2007), precluded the Nebraska Supreme Court from finding that text messages from the cell phone found on Henderson were admissible under the good faith exception to the exclusionary rule (filing no. 14-17 at CM/ECF pp. 15-16).

Henderson further alleged that he was denied his constitutional right to a fair trial because the State committed prosecutorial misconduct when it (1) used the "J Town" text messages for the truth of the matter asserted; (2) appealed the trial court's

decision finding no probable cause by arguing that there was probable cause, in violation of Neb. Rev. Stat. § 29-2315.01; and (3) allowed James Garrett to testify at trial that he was not receiving "any sort of deal in exchange" for his testimony. (Filing No. 14-17 at CM/ECF pp. 17-19.)

Finally, Henderson alleged that he was denied a fair trial because the trial court erred when it (1) denied his motions to suppress the evidence from his cell phone; (2) overruled his motion in limine regarding the "J Town" text messages; (3) rejected his proposed limiting instruction regarding the "J Town" text messages; (4) instructed the State to get a second search warrant after a search had already been conducted; (5) overruled his motion for mistrial regarding Herfordt's "infamous gang member" testimony; (6) overruled his motion for mistrial and motion to strike Narvaez's testimony and did not permit trial counsel to voir dire Narvaez; and (7) overruled his chain-of-custody and foundation objections to the items seized from him while in custody. (*Id.* at CM/ECF pp. 19-25.)

In response to Henderson's amended postconviction motion, the State filed a motion to dismiss. (*Id.* at CM/ECF pp. 58-59.) In a written order filed May 1, 2017, the state district court denied postconviction relief without an evidentiary hearing. (*Id.* at CM/ECF pp. 60-75.) It determined that Henderson had failed to show either that he had received deficient representation or that he had suffered prejudice. (*Id.* at CM/ECF pp. 67-74.) The court also determined that Henderson's claims of prosecutorial misconduct and trial court error were procedurally barred because they could have been brought on direct appeal. (*Id.* at CM/ECF p. 75.)

Henderson appealed to the Nebraska Supreme Court, assigning and arguing that the state district court erred in denying him an evidentiary hearing on his application for postconviction relief on almost all his ineffective assistance of trial counsel claims. (Filing No. 14-12 at CM/ECF pp. 5, 25-40.) Henderson also argued that appellate counsel was ineffective for failing to raise on direct appeal (1) that the trial court erred in rejecting his proposed limiting instruction regarding the text messages; (2) Fourth Amendment violations concerning the search of his cell phone;

(3) that Narvaez's testimony was irrelevant (*id.* at CM/ECF p. 37); and (4) that the opinion in *Tompkins*, 723 N.W.2d 344, precluded the Nebraska Supreme Court from finding that text messages from the cell phone found on Henderson were admissible under the good faith exception to the exclusionary rule. (Filing No. 14-12 at CM/ECF pp. 36-41).

In a published opinion filed November 30, 2018, the Nebraska Supreme Court affirmed the state district court's decision to deny Henderson's postconviction claims without an evidentiary hearing. (Filing No. 14-2.)

## D.  Habeas Petition

Henderson filed his Petition for Writ of Habeas Corpus in this court on March 20, 2019. (Filing No. 1.) In response to the Petition, Respondents filed an Answer (filing no. 17), a Brief (filing no. 18), and the relevant state court records (filing no. 14). Respondents argue that Henderson's claims are either procedurally defaulted or without merit. Henderson filed a brief (filing no. 21) in response to Respondents' Answer, and Respondents filed a reply brief (filing no. 26).[3] This matter is fully submitted for disposition.

---

[3] On February 14, 2020, after briefing had been completed and this habeas case was ripe for decision, Respondents filed a Supplemental Designation of State Court Records in Support of Answer (filing no. 27) to notify the court that Respondents' counsel was contacted by an employee of the Douglas County District Court Clerk's Office and informed that DVDs in Henderson's case had been located in the Sarpy County District Court Clerk's Office. Counsel was unaware the DVDs were missing from the state court records until the employee contacted her. (*Id.*) On February 24, 2020, Henderson filed a Motion for Subpoena Duces Tecum requesting that Respondents be required "to provide [him] with the records (videos) for physical review" "because said D.V.D.'s could be material evidence in the matter" and "are potent[i]ally critical to the defense of his case." (Filing No. 28.) The court entered an order (filing no. 30) directing Respondents to file copies of the six DVDs identified in the Supplemental Designation of State Court Records but denied Henderson's request to have copies of the DVDs physically provided to him at that time as he failed to demonstrate good cause or need for such discovery or how the DVDs are relevant to his habeas claims. Respondents filed copies of the six DVDs

### III.  OVERVIEW OF APPLICABLE LAW

Three strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Henderson's claims.

### A.  Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

_____

(filing no. 31) identified in the Supplemental Designation of State Court Records (filing no. 27) as directed by the court. The court reviewed the DVDs and found that the only evidence relevant to Henderson's habeas claims on the DVDs had already been provided by Respondents. (Filing No. 32; *see also* Filing No. 14-23 at CM/ECF pp. 56-57, 62.) Accordingly, the court advised the parties that it would not rely on any of the DVDs in assessing Henderson's habeas claims. (Filing No. 32.)

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska Supreme Court directly[4] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner.  *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

---

[4] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106 (West).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

**B.  Nebraska Law Relevant to Procedural Default**

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased.").

Moreover, a person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.") Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

Note also that Nebraska has a statute of limitations for bringing postconviction actions that is similar to federal law. It reads:

> (4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:

19

(a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;

(b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;

(c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;

(d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review; or

(e) August 27, 2011.

Neb. Rev. Stat. § 29-3001(4) (West).

## C.  Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06.

Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## D.  The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's

"strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016). To demonstrate prejudice on account of appellate counsel's failure to raise a claim on appeal, a petitioner must show a "reasonable probability that an appeal of [the] issue would have been successful and that the result of the appeal would thereby have been different." *Pryor v. Norris*, 103 F.3d 710, 714 (8th Cir. 1997). The petitioner must show more than that the alleged error had some conceivable effect on the outcome of the proceeding. *Id.* at 713. "'Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693).

23

# IV.  DISCUSSION

## A.  Claim One

Claim One consists of multiple allegations of ineffective assistance of trial counsel.

### 1.  Subpart (1)

Henderson asserts that he was denied effective assistance of counsel because trial counsel failed to raise and argue Henderson's actual innocence. (Filing No. 1 at CM/ECF p. 19.) He claims that the "only crime [he] committed was 'possessing a firearm' when he picked up the discarded murder weapons." (*Id.*)

As Respondents point out, Henderson did not raise this claim in his amended postconviction motion. Thus, this claim is now procedurally defaulted, not unexhausted, because Nebraska courts would not consider a successive postconviction motion on this claim. *See State v. Sims*, 761 N.W.2d 527, 533 (Neb. 2009) ("[A]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion"); *Ortiz*, 670 N.W.2d at 792 (same). Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations.

Assuming, without deciding, that *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), apply to federal habeas corpus cases arising from Nebraska convictions,[5] the holding in these cases do nothing to excuse the

---

[5] The court does not believe that *Martinez v. Ryan*, 566 U.S. 1 (2012), or *Trevino v. Thaler*, 569 U.S. 413 (2013), applies in Nebraska. *See Kidder v. Frakes*, 400 F. Supp. 3d 809, 818 n.4 (D. Neb. 2019). This is because Nebraska demands that ineffective assistance of trial counsel claims be raised on direct appeal when

procedural default of Henderson's ineffective assistance of trial counsel claim. In *Martinez*,[6] the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. at 17. Accordingly, under *Martinez*, a petitioner may claim ineffective assistance of postconviction counsel to establish "cause" for procedural default of a habeas claim of ineffective assistance of trial counsel. To establish cause in this manner, the petitioner must show that postconviction counsel's assistance was ineffective under the standards of *Strickland*, and further demonstrate that his underlying claim of ineffective assistance of trial counsel is a "substantial" one, that is, that the claim has some merit. *Martinez*, 566 U.S. at 14. If the State demonstrates that the underlying claim of ineffective assistance of trial counsel is unsubstantial or non-meritorious, the petitioner cannot establish that postconviction counsel was ineffective and thus cannot show cause for default of the underlying claim. *Id.* at 15-16.

The court finds that Henderson's ineffective assistance of trial counsel claim is refuted by the record and lacking in merit. In closing, trial counsel advanced the very argument that Henderson now claims he did not raise: Henderson was at the scene of the crime and was found in possession of the two firearms, but he was not one of the shooters; thus, he was only guilty of being a prohibited person in possession of a firearm and could not be guilty of first degree murder, attempted first degree murder, and use of a deadly weapon to commit the foregoing felonies. (*Compare* Filing No. 1 at CM/ECF p. 19 *with* Filing No. 14-22 at CM/ECF pp. 202-09.) Because this claim is without merit, *Martinez* does not apply to excuse the procedural default. Thus, Henderson is not entitled to habeas relief on Claim One, Subpart (1).

_____

appellate counsel is different than trial counsel. *State v. Filholm*, 848 N.W.2d 571, 576 (Neb. 2014).

[6] For the sake of brevity, the court will refer to *Martinez* and *Trevino* collectively as "*Martinez*" throughout this Memorandum and Order.

## 2.  Subpart (2)

Henderson alleges that he was denied effective assistance of counsel because trial counsel failed to move to compel DNA and gunshot residue testing. (Filing No. 1 at CM/ECF pp. 19–20, 47–49.)

### a.  DNA Testing

Henderson alleges that there were "multiple D.N.A. samples on the grips of the weapons" and that trial counsel was ineffective for failing to move to compel testing on those samples. (*Id.* at CM/ECF p. 48.) Henderson then names only one person—James Garrett—whose DNA should have been tested. (*Id.*)

In his amended postconviction motion, Henderson did not identify James Garrett as an individual whose DNA should have been tested. (Filing No. 14-7 at CM/ECF pp. 7-8.) Thus, Henderson's claim that trial counsel was ineffective for failing to move to compel testing on James Garrett is now procedurally defaulted, not unexhausted, because Nebraska courts would not consider a successive postconviction motion on that claim. *See Sims*, 761 N.W.2d at 533; *Ortiz*, 670 N.W.2d at 792. Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations.

The court finds that *Martinez* does not apply to excuse the procedural default, because the ineffective assistance of trial counsel claim is lacking in merit. As discussed directly below, the DNA analyst testified at trial that a mixture of DNA from at least three people was found on the grip of one of the guns recovered upon Henderson's arrest, but testing could not show the identities of those sources with any degree of certainty. (Filing No. 14-2 at CM/ECF p. 11.) The DNA analyst's testimony suggests that even if James Garrett's DNA sample had been tested and compared to the DNA mixture on the gun grip, the result would have been inconclusive. Therefore, Henderson fails to show a reasonable probability that DNA testing on James Garrett would have resulted in a different outcome at trial.

Accordingly, Henderson's claim that trial counsel was ineffective for failing to move to compel DNA testing on James Garrett necessarily fails.

Henderson did assert both in his amended postconviction motion (filing no. 14-7 at CM/ECF pp. 7-8) and in his brief on postconviction appeal (filing no. 14-12 at CM/ECF pp. 32-33), that trial counsel was ineffective for failing to move for DNA testing on a sample taken from Jeremy Terrell, another suspect in the case. To the extent Henderson is asserting this same claim in his Petition, the court concludes that it is without merit. In its opinion affirming the state district's denial of postconviction relief, the Nebraska Supreme Court considered and rejected the claim as follows:

> As previously mentioned, shortly before the shooting, text messages were sent from the cell phone found on Henderson's person. Those messages were responses to text messages from a telephone number assigned to Terrell, also referred to as "Jay Town." The correspondence indicated that "Jay Town" and the recipient were attempting to meet one another outside the after-hours party where the shooting occurred and that the individual who stabbed "Jb" was there. Terrell was not apprehended at the scene of the shootings. Police later attempted to interview him, but he refused to provide any information. Police obtained a DNA sample from Terrell, but the sample was not tested.

> Law enforcement conducted DNA testing on samples taken only from Henderson and Voss. That testing led to the conclusion that blood found on Henderson's shirt and shoes had come from Voss. It also showed a mixture of DNA from at least three people on the grip of one of the guns recovered upon Henderson's arrest, but testing could not show the identities of those sources with any degree of certainty. A DNA analyst explained that because of the mixture, many people could be indicated and the probability that a random individual matched a DNA profile found in the mixture was 1 in 3 for Caucasians, 1 in 2 for African Americans, and 1 in 4 for Hispanic Americans. The DNA analyst testified that consequently, test results comparing the mixture to Henderson's and Voss' DNA were inconclusive, meaning that she could not be certain whether either man's DNA was present or not present on the gun grip.

27

In his application for postconviction relief, Henderson referenced the mixture of DNA from at least three people and alleged that testing Terrell's sample "may have" exculpated Henderson on its own or led to a more thorough investigation that "could have" revealed more evidence pointing to "the actual shooters." Even if we were to consider Henderson's allegation sufficiently specific, he has failed to show ineffective assistance of counsel. The DNA analyst's testimony suggests that even if Terrell's DNA sample had been tested and compared to the DNA mixture on the gun grip, the result would have been inconclusive, and Henderson makes no allegation that the DNA analyst's testimony was incorrect. Therefore, Henderson's motion failed to show a reasonable probability that DNA testing would have resulted in a different outcome at trial. In the absence of any prejudice to Henderson, then, the district court did not err in denying Henderson an evidentiary hearing concerning DNA testing.

(Filing No. 14-2 at CM/ECF p. 11.)

The court finds that the Nebraska Supreme Court reasonably applied *Strickland* in concluding that Henderson had not demonstrated prejudice from trial counsel's failure to move for DNA testing on a sample taken from Jeremy Terrell. Thus, applying the deferential standards required by both *Strickland* and by 28 U.S.C. § 2254(d), the court finds nothing to indicate that the Nebraska Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence or was contrary to, or involved an unreasonable application of, clearly established Federal law.

### b.  Gunshot Residue Testing

Henderson argues that he was denied effective assistance of counsel because trial counsel failed to move to compel gunshot residue testing on the swabs taken from Kevin Washington, James Garrett, Antonio Washington, and Matthew Voss. (Filing No. 1 at CM/ECF p. 48.) Henderson also argues that trial counsel was ineffective for failing to move to compel gunshot residue testing on Henderson. (*Id.* at CM/ECF pp. 19–20, 47–48.)

In his amended postconviction motion, Henderson did not raise the claim that trial counsel was ineffective for failing to move to compel gunshot residue testing on Henderson.[7] (Filing No. 14-7 at CM/ECF pp. 7-8.) Thus, this claim is now procedurally defaulted, not unexhausted, because Nebraska courts would not consider a successive postconviction motion on that claim. *See Sims*, 761 N.W.2d at 533; *Ortiz*, 670 N.W.2d at 792. Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations.

The court finds that *Martinez* does not apply to excuse the procedural default, because the ineffective assistance of trial counsel claim is lacking in merit. An officer involved in the investigation testified that, because Henderson handled the "murder weapons" after they had been fired, "he would have had GSR on his hands." (Filing No. 14-21 at CM/ECF pp. 189-90.) This evidence certainly would not have exculpated Henderson. Thus, trial counsel's decision not to compel gunshot residue testing on Henderson was reasonable trial strategy.

Henderson did raise, both in his amended postconviction motion (filing no. 14-7 at CM/ECF p. 8) and in his brief on postconviction appeal (filing no. 14-12 at CM/ECF pp. 32-33), that he was denied effective assistance of counsel because trial counsel failed to move to compel gunshot residue testing on the swabs taken from Kevin Washington, James Garrett, Antonio Washington, and Matthew Voss. In rejecting this claim on postconviction appeal, the Nebraska Supreme wrote:

> Henderson contends that gunshot residue swabs were taken from Voss, Antonio Washington, and two other individuals who were present at the scene. Henderson asserts that these swabs were never submitted for testing and that such testing "could have implicated other suspects in the shooting" or provided him with "alternative theories of defense." Evidence introduced at trial, however, demonstrated that gunshot

---

[7] Henderson referenced trial counsel's failure to compel gunshot residue testing on Henderson in his brief on postconviction appeal before the Nebraska Supreme Court. (Filing No. 14-12 at CM/ECF p. 33.) The court did not address the argument, presumably because it was not raised in the postconviction motion.

29

residue testing would not have made a difference. An officer involved in the investigation testified that a finding of gunshot residue on a person does not definitively show that the person had fired a gun, because a person can also come into contact with gunshot residue by being in the vicinity of gunfire. Because the individuals from whom gunshot residue swabs were obtained either were victims or were known to be at the scene, a finding of gunshot residue on them would not have implicated them or exculpated Henderson. In light of this testimony, the correctness of which Henderson does not dispute, Henderson's counsel could not have acted deficiently by not seeking gunshot residue testing and Henderson suffered no prejudice.

(Filing No. 14-2 at CM/ECF pp. 10-11.)

Henderson contends that the Nebraska Supreme Court "made faulty fact finding when the court ruled that testing of the G.S.R. kits would not have proved anything and wouldn't have helped exculpated [sic] Henderson." (Filing No. 21 at CM/ECF p. 15.) Henderson argues that the Nebraska Supreme Court erroneously based its conclusion on an officer's trial testimony that gunshot residue testing does not prove "who did the shooting," "just who was around." (*Id.* at CM/ECF p. 16.) Henderson alleges that the officer's testimony was "false and not supported by any facts," because "[w]hen a person fires a gun that person will have more G.S.R. on there [sic] hands and clothes than a person who was standing next to a person firing a gun, also that person would have more G.S.R. on there [sic] hands than a person who just picked the gun up." (*Id.*)

As an initial matter, the Nebraska Supreme Court specifically stated that Henderson did not dispute the "correctness" of the officer's trial testimony, which included testimony that "a *finding* of gunshot residue on a person does not definitively show that the person had fired a gun, because a person can also come into contact with gunshot residue by being in the vicinity of gunfire." (Filing No. 14-2 at CM/ECF p. 11 (emphasis added).) The Nebraska Supreme Court's determination that, "[b]ecause the individuals from whom gunshot residue swabs were obtained either were victims or were known to be at the scene, a finding of

gunshot residue on them would not have implicated them or exculpated Henderson," was not based on an unreasonable determination of the facts in light of the officer's trial testimony. Moreover, the Nebraska Supreme Court reasonably applied *Strickland* in concluding that trial counsel could not have acted deficiently by not seeking gunshot residue testing and that Henderson suffered no prejudice from trial counsel's performance.

Henderson's argument here, however, is more focused on the *amount* of gunshot residue found on a person. As to that issue, the officer testified that the "amount of residue" and "intensity of the particles" of the gunshot residue can help determine whether an individual fired a gun or was in the vicinity of a fired gun as opposed to just handling a fired gun. (Filing No. 14-21 at CM/ECF pp. 190, 197.) Henderson now argues that gunshot residue testing on the swabs taken from Kevin Washington, James Garrett, Antonio Washington, Matthew Voss, and himself would have revealed less residue on him than the others, which would have shown that he was not the shooter. (*See* Filing No. 21 at CM/ECF pp. 13, 16.) Henderson did not present this amount-of-residue argument in the Nebraska state courts, and thus, it is arguably procedurally defaulted. Nonetheless, the argument ignores the other possibility that gunshot residue testing would reveal that there was *more* gunshot residue on Henderson than on the other individuals. Such evidence certainly would not have been exculpatory. Thus, trial counsel's decision not pursue gunshot residue testing was reasonable trial strategy and did not constitute ineffective assistance.

For all the above reasons, Henderson is not entitled to habeas relief on Claim One, Subpart (2).

### 3. Subpart (3)

Henderson contends that he was denied effective assistance of counsel because trial counsel failed to interview or call witnesses Joeanna Ball, Deonta Marion, and Timothy Washington to testify. (Filing No. 1 at CM/ECF pp. 20–23.)

31

### a. Joeanna Ball

Henderson did not allege that trial counsel failed to interview or call Joeanna Ball as a witness in his amended postconviction motion. (Filing No. 14-17 at CM/ECF pp. 6-7.) Thus, this claim is now procedurally defaulted, not unexhausted, because Nebraska courts would not consider a successive postconviction motion on that claim. *See Sims*, 761 N.W.2d at 533; *Ortiz*, 670 N.W.2d at 792. Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations.

The court finds that *Martinez* does not apply to excuse the procedural default, because the ineffective assistance of trial counsel claim is lacking in merit. According to Henderson, Joeanna Ball, who did not see the shooting but was assisting the victims at the crime scene, told the police that, just because someone at the scene of the shooting had blood on their clothing "doesn't mean they did the shooting because she also had blood on her shoes as well." (Filing No. 1 at CM/ECF p. 20.) This testimony, however, would not have been exculpatory. Henderson simply fails to demonstrate a reasonable probability that this testimony would have resulted in a different outcome at trial. Accordingly, Henderson's claim that trial counsel was ineffective for failing to interview or call Joeanna Ball as a witness necessarily fails.

### b. Deonta Marion

Next, Henderson argues that trial counsel was ineffective for failing to interview or call Deonta Marion as a witness. He contends that, had Marion been called, his testimony regarding the shooters' clothing would have "impeached" the State's theory that Henderson was one of the shooters. (*Id.* at CM/ECF p. 21.)

Henderson raised this claim in his amended postconviction motion and subsequent appeal. In its opinion on postconviction appeal, the Nebraska Supreme Court considered and rejected the claim as follows:

Next, Henderson asserts that he is entitled to postconviction relief because his trial counsel failed to call Deonta Marion. Henderson alleged in his motion for postconviction relief that Marion gave a statement to police regarding the shooting. Henderson attached a document to his motion that appears to be a police report documenting that statement. The report stated that Marion described one shooter as wearing a "'white or a light-colored short-sleeve shirt'" and the other as wearing "'dark clothing.'" Later in the report, the author noted that Marion had initially provided a false name to law enforcement. Henderson argues that had Marion been called, his testimony regarding the shooters' clothing would have undercut the State's theory that Henderson was one of the shooters because Henderson was wearing a tan "Carhartt" jacket when he was apprehended. Brief for appellant at 24.

We recently addressed two related cases in which defendants contended that trial counsel failed to call witnesses who would have identified the perpetrators of crimes as having different characteristics than the defendants charged with those crimes. In *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018), and *State v. Stricklin*, 300 Neb. 794, 916 N.W.2d 413 (2018), the codefendants, who were both African American, contended that their counsel deficiently failed to call witnesses. They claimed the witnesses would have testified that the perpetrators were unnamed "'Mexicans'" or "'Latino's.'" *State v. Newman*, 300 Neb. at 782, 916 N.W.2d at 406. Accord *State v. Stricklin, supra*. We concluded that these allegations did not show a reasonable likelihood that, absent the alleged deficiency, the outcome at trial would have been different.

In so finding, we applied the approach that the U.S. Supreme Court set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984), to analyze prejudice:

> "In making [the prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence,

33

altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."

*State v. Newman*, 300 Neb. at 782-83, 916 N.W.2d at 407, quoting *Strickland v. Washington, supra*. See, also, *State v. Stricklin, supra*. In both cases, we concluded that in the context of all the evidence adduced at trial, the omitted testimony "would not have altered the evidentiary picture and would, at best, have had an isolated or trivial effect on the jury's findings." See *State v. Newman*, 300 Neb. at 783, 916 N.W.2d at 407. Accord *State v. Stricklin, supra*.

Similarly, here, there is overwhelming evidentiary support for the jury's verdict, which we summarized on direct appeal:

Henderson was apprehended by police as he was running from the scene of the incident. A person who was at the scene had identified Henderson to a police officer as one of the shooters. The other suspect was not apprehended. One gun was found on Henderson's person when he was arrested, and a police officer saw Henderson throw another gun under a vehicle as the officer was chasing him.

Forensic evidence presented at trial indicated that bullets and casings found at the scene of the shootings had been fired from the gun found on Henderson and from the gun he was seen throwing under a vehicle. A fingerprint on the gun found under the vehicle matched Henderson's. In addition, DNA testing of blood found on the clothing worn by Henderson at the time of his arrest indicated that the blood had come from Voss.

34

> The State maintained at trial that Henderson shot Voss and [Antonio] Washington to retaliate for an assault on Henderson's friend, Jimmy Levering. Levering and Voss had both been inmates at a prison in Florida, and Voss had allegedly stabbed and punched Levering.

*State v. Henderson*, 289 Neb. 271, 274-75, 854 N.W.2d 616, 624 (2014). In addition to the evidence quoted above, text messages obtained from a cell phone found on Henderson's person indicated that the two people exchanging the messages around the time of the shooting were attempting to meet one another outside the party where the shooting occurred and that the individual who stabbed "'Jb'" was there. *Id.* at 277, 854 N.W.2d at 625. The background of the cell phone's screen was a picture of Jimmy Levering.

When we weigh the effect of counsel's allegedly deficient failure to call Marion against the remaining evidence, we conclude that there is not a reasonable likelihood the outcome would have been different had Marion testified. Henderson's presence at the scene, his possession of the weapons used in the shooting, the blood matching the DNA profile of one of the victims on his clothing, and the evidence of his pre-meditative intent to retaliate against someone he believed to be present at the scene are highly suggestive of his guilt. To reach a different conclusion, the jury would have to find that just after Henderson had received a text message that someone who had stabbed his acquaintance was at a party in downtown Omaha, Henderson went to such a party where someone else shot a person who had assaulted Henderson's friend Levering in prison when Henderson happened to be sufficiently nearby to get blood matching the DNA profile of the victim on his clothes, and that Henderson somehow took possession of both guns used in the crime and fled the scene with them. We find the likelihood of the jury's reaching such a conclusion to be exceedingly low.

Our prejudice analysis is also informed by the fact that Henderson relied on another account of the shooters' attire at trial but was unable to convince the jury of his innocence. The evidence showed that Henderson was apprehended wearing a tan Carhartt jacket that had a hood. However, an eyewitness, Charles Bird, testified that one shooter wore a light-colored or gray "hoodie" and the other wore a dark-colored hoodie. Henderson's counsel highlighted Bird's testimony during

closing arguments, noting that the witness did not describe a tan jacket like Henderson wore that night. Even so, the jury found Henderson guilty.

The State points to Henderson's reliance on Bird's testimony and contends that it shows that Marion's testimony would not have made a difference. In this case, we agree. We can envision a circumstance in which testimony of a purported eyewitness that the perpetrator of a crime lacked certain characteristics of the defendant might corroborate similar testimony of another purported eyewitness and thus meaningfully assist the defense. However, for multiple reasons, we do not believe Marion's testimony would have had that effect here. First, it is not clear that Marion's testimony would have corroborated Bird's: Bird identified the shooters as wearing hoodies, and Marion identified one of the shooters as wearing a short-sleeved shirt. And even if the chance that Marion's testimony would undercut rather than corroborate Bird's is set to the side, the testimony would not necessarily have been exculpatory, because there was evidence that Henderson was wearing a white short-sleeved shirt under his jacket. Finally, there is still the overwhelming evidence of Henderson's guilt set forth above. Given the nature of this evidence, we are convinced that the jury would have reacted to the testimony Henderson claims Marion would have given the same way it did to the testimony of Bird, which Henderson relied on at trial.

Because Marion's testimony would not have meaningfully altered the evidentiary picture and any impact on the jury's findings would have been isolated and trivial, we hold that the district court did not err in denying this claim of ineffective assistance of counsel without an evidentiary hearing.

(Filing No. 14-2 at CM/ECF pp. 7-9.)

The court must grant substantial deference to the Nebraska Supreme Court's decision on this issue. The court has carefully reviewed the record in this matter and finds that the Nebraska Supreme Court's decision is not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Nebraska Supreme Court reviewed all the

evidence and determined, based on *Strickland*, that Henderson was not prejudiced by trial counsel's failure to call Deonta Marion as a witness. Henderson has not established that the Nebraska Supreme Court's decision on this issue was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, Henderson is not entitled to habeas relief on this claim.

### c. Timothy Washington

Although Henderson's ineffective assistance of counsel claim regarding trial counsel's failure to interview or call Timothy Washington as a witness was raised in his amended postconviction motion and subsequent appeal, the Nebraska Supreme Court did not reach the merits of this claim because Henderson's amended postconviction motion did not include specific allegations as to the testimony Washington would have given if called at trial. (Filing No. 14-2 at CM/ECF pp. 6-7.) The Nebraska Supreme Court wrote:

> First, Henderson claims his trial counsel should have called Timothy Washington. Henderson argues that had Timothy Washington been called to testify, he would have rebutted the testimony of a witness called by the State, Vasili Petrihos. At trial, Petrihos testified that a young black man, who was later apprehended and identified as Henderson, was "tensed up and all hyped up," "huffing and puffing," and "getting aggravated" and appeared "ready to fight" near the shooting site immediately prior to the shooting.
>
> In his motion for postconviction relief, however, Henderson did not reference Petrihos or his testimony. Henderson asserted only that Timothy Washington was willing to testify about Henderson's "demeanor and the direction . . . Henderson had been headed . . . minutes before the shooting" and that such testimony could have impeached the testimony of other unspecified witnesses as to Henderson's whereabouts, demeanor, and actions in the minutes before the shooting. The motion did not explain what Timothy Washington would have testified regarding Henderson's location, demeanor, or direction.

The lack of explanation as to what Timothy Washington would have testified is relevant because in a motion for postconviction relief, a defendant is required to specifically allege what the testimony of potential witnesses would have been if they had been called. See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014). Absent specific allegations, a motion for postconviction relief is subject to dismissal without an evidentiary hearing. See *id.* Because Henderson's motion did not describe Timothy Washington's alleged testimony with sufficient specificity, an evidentiary hearing was not warranted.

(*Id.* at CM/ECF pp. 6-7.)

The Nebraska Supreme Court's decision not to consider the merits of the claim was based on a firmly established state procedural rule. That is, in Nebraska, a petitioner is required to specifically allege in a motion for postconviction relief what the testimony of potential witnesses would have been if they had been called in order to avoid dismissal without an evidentiary hearing. *See State v. Abdullah*, 853 N.W.2d 858, 867 (Neb. 2014); *State v. Marks*, 835 N.W.2d 656 (Neb. 2013); *State v. McGhee*, 787 N.W.2d 700 (Neb. 2010); *State v. Davlin*, 766 N.W.2d 370 (Neb. 2009). Therefore, this portion of Claim One, Subpart (3), is procedurally defaulted pursuant to an independent and adequate state procedural rule. *See Hunt v. Houston*, 563 F.3d 695, 703 (8th Cir. 2009) ("Federal courts generally will not review claims that a state court has refused to consider because of the petitioner's failure to satisfy a state procedural requirement"); *Shaddy v. Clarke*, 890 F.2d 1016, 1018 (8th Cir. 1989) ("[O]nly if the state court issues a 'plain statement' that it is rejecting petitioner's federal claim on state procedural grounds will federal habeas courts be precluded from reaching the merits of the claim."). The claim is now procedurally defaulted, not unexhausted, because the Nebraska courts would not entertain a successive postconviction motion based on that claim. Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations.

Alternatively, the court finds the ineffective assistance of trial counsel claim without merit. Henderson does not set out how long before the shooting Timothy

Washington saw Henderson or how far from the scene of the shooting Timothy Washington encountered Henderson. Therefore, Henderson fails to show how Timothy Washington's testimony would have meaningfully altered the evidentiary picture and changed the outcome of the trial, particularly with regard to impeaching the testimony of Vasili Petrihos. As the state district court noted, Vasili Petrihos' potential bias "was brought out in the evidence and the jury was allowed to make its own determination as to his bias and credibility." (Filing No. 14-17 at CM/ECF p. 71.) Henderson is not entitled to habeas relief on this claim.

### 4.  Subpart (4)

Henderson alleges that trial counsel was ineffective for failing to request an instruction on a co-conspirator rule and its application to hearsay exceptions. (Filing No. 1 at CM/ECF p. 44.)

Henderson did not raise this claim in his amended postconviction motion. Thus, the claim is now procedurally defaulted, not unexhausted, because Nebraska courts would not consider a successive postconviction motion on that claim. *See Sims*, 761 N.W.2d at 533; *Ortiz*, 670 N.W.2d at 792. Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations.

The court finds that *Martinez* does not apply to excuse the procedural default, because the ineffective assistance of trial counsel claim is lacking in merit.[8]

---

[8] Henderson also asserts that trial counsel's failure to raise this claim "on appeal" should be scrutinized under *Flanders v. Graves,* 299 F.3d 974 (8th Cir. 2002). (Filing No. 21 at CM/ECF p. 21.) *Flanders* involved a time-barred habeas petition and held that to make a viable claim that 28 U.S.C. § 2244(d)(1) should be equitably tolled based on actual innocence, petitioner would have to show some action or inaction on the part of State that prevented him from discovering relevant facts in a timely fashion, or that a reasonably diligent petitioner could not have discovered facts in time to file a petition within the limitation period. *Id.* at 976-78. Respondents do not argue that Henderson's habeas petition is time barred. Thus,

Henderson filed a motion in limine prior to trial seeking to preclude the State from introducing evidence of the content of text messages found on the cell phone because the text messages were inadmissible hearsay. (Filing No. 14-1 at CM/ECF p. 17; Filing No. 14-16 at CM/ECF pp. 56-57.) The trial court overruled the motion in limine based on the State's argument that the evidence was not being offered for the truth of the matters asserted but instead to show the impact of the messages on Henderson's state of mind, which was relevant to proving premeditation with respect to the charge of the first degree murder of Voss. (Filing No. 14-1 at CM/ECF p. 17; Filing No. 14-18 at CM/ECF pp. 117-19.) On the first day of trial, the State argued that the text messages were also admissible in the alternative under the co-conspirator exception to hearsay. (Filing No. 14-18 at CM/ECF pp. 141-42.) The trial court stated that its "ruling was the same," noting that it had overruled Henderson's motion in limine "for the reasons we all discussed prior." (Id. at CM/ECF p. 142.) Henderson later renewed his hearsay objections, and the State argued the admissibility of the text messages under the two alternative grounds. (Filing No. 14-20 at CM/ECF pp. 89-94.) The trial court overruled the objection, stating, "We talked about it on the record the other day. I'll overrule your objection." (Id. at CM/ECF pp. 93-94.) The trial court declined to give Henderson's proposed limiting instruction (filing no. 14-16 at CM/ECF p. 99) that the text messages were offered to show Henderson's state of mind and not for the truth of the matter asserted. (Filing No. 14-22 at CM/ECF pp. 123-30.) It was at this time that the trial court found the text messages fell under the co-conspirator exception. (Id. at CM/ECF p. 130.) During closing arguments, the State argued that the text messages helped to show that Henderson's actions were premeditated and deliberate. (Id. at CM/ECF pp. 135, 152-54.)

On direct appeal, the Nebraska Supreme Court concluded that the text messages "were not admitted for the truth of the statements contained therein but

---

*Flanders* is inapplicable. To the extent Henderson relies on *Flanders* to excuse any other defaulted claims, his reliance is similarly misplaced.

instead for the purpose of showing their effect on Henderson." (Filing No. 14-1 at CM/ECF p. 17.) The court wrote:

> The State used the messages to show that Henderson believed that an individual who was responsible for an attack on an acquaintance of his was at the location where the shootings would eventually occur and that Henderson coordinated with other individuals to go to that place in order to retaliate. The messages were not used to establish that the individual was at that location or that the individual had attacked Henderson's acquaintance. Instead, the messages were offered to support the State's theory that Henderson went to the location for the purpose of retaliating against the person who assaulted his acquaintance, which was relevant to the premeditation element of first degree murder. We therefore conclude that because the evidence was not hearsay, the district court did not err when it admitted the evidence over Henderson's hearsay objection.

(*Id.* at CM/ECF pp. 17-18.)

In light of the Nebraska Supreme Court's conclusion that the text messages were not admitted for the truth of the matter asserted, trial counsel could not have been ineffective for any failure to request an instruction on a co-conspirator rule and its application to hearsay exceptions. Accordingly, Henderson is not entitled to habeas relief on Claim One, Subpart (4).

## 5. Subpart (5)

Henderson asserts that he was denied effective assistance of counsel because trial counsel failed to object to Ramone Narvaez's testimony based on irrelevance until after his testimony was complete. (Filing No. 1 at CM/ECF pp. 52–53.)

Henderson raised this claim in his amended postconviction motion and subsequent appeal. In its opinion on postconviction appeal, the Nebraska Supreme Court considered and rejected the claim as follows:

Narvaez, a correctional officer from a federal penitentiary in Florida, testified that in 2009, he witnessed an altercation between Levering and an inmate named "Voss." As noted above, the State contended that Henderson shot Voss and Antonio Washington to retaliate for an assault on Henderson's friend, Levering. Henderson argues his trial counsel provided ineffective assistance by failing to object to the Narvaez testimony on relevance grounds until after it was complete . . . .

Henderson cannot establish that he received ineffective assistance of counsel regarding the Narvaez testimony. Contrary to Henderson's assertion, the relevance and allegedly prejudicial nature of the Narvaez testimony was addressed on direct appeal. We specifically stated that the testimony was "relevant to the State's case and was not unfairly prejudicial." *State v. Henderson*, 289 Neb. 271, 301, 854 N.W.2d 616, 640 (2014). Because we have already rejected the evidentiary objections that Henderson contends his counsel should have raised, . . . we need not revisit whether his trial counsel was ineffective in not objecting on relevance grounds during Narvaez' testimony. See *State v. Thorpe*, 290 Neb. 149, 858 N.W.2d 880 (2015).

(Filing No. 14-2 at CM/ECF p. 15.)

The Nebraska Supreme Court determined on direct appeal that "Narvaez' testimony was relevant to the State's case and was not unfairly prejudicial" because:

Although Narvaez did not know the first name of the person he identified as "Voss," another witness, Perna, testified that he had visited "Matthew Voss" in the prison in Florida, and Perna identified the murder victim in this case as the "Voss" he visited in Florida. Perna also testified that Levering was discussed during his conversation with "Voss" in Florida.

(Filing No. 14-1 at CM/ECF p. 21.)

The court finds that the Nebraska Supreme Court reasonably applied *Strickland* in concluding that Henderson failed to establish that he received ineffective assistance of counsel regarding Narvaez's testimony. Indeed, any

relevancy objection made during Narvaez's testimony would have been without merit. Thus, applying the deferential standards required by both *Strickland* and by 28 U.S.C. § 2254(d), the court finds nothing to indicate that the Nebraska Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence or was contrary to, or involved an unreasonable application of, clearly established Federal law. Thus, Claim One, Subpart (5), is denied.

### 6.  Subpart (6)

Henderson argues that he was denied effective assistance of counsel because trial counsel (1) failed to impeach Officer Sarka's testimony, (2) failed to introduce audio and video evidence from Sarka's cruiser to the jury, and (3) failed to move to strike the portion of Sarka's testimony "identifying the defendant as the shooter from what someone else told him." (Filing No. 1 at CM/ECF pp. 56–57.)

Henderson raised the first two allegations in his amended postconviction motion but not the third allegation. (Filing No. 14-17 at CM/ECF pp. 17-18.) Thus, the third allegation is procedurally defaulted for failure to raise it in his amended postconviction motion. The first two allegations are procedurally defaulted because Henderson did not specifically assign and argue them in his brief on postconviction appeal before the Nebraska Supreme Court (filing no. 14-12), contrary to a firmly established and regularly followed state practice. *See Filholm*, 848 N.W.2d 571. Henderson cannot now raise any of these claims in a successive state postconviction motion, and the claims would also be barred by Nebraska's statute of limitations on postconviction motions.

The court finds that Henderson cannot rely on *Martinez* to save the procedural default of these claims. With regard to the first two allegations, even if *Martinez* does apply generally in Nebraska, the court does not believe that it applies where ineffective assistance of trial counsel claims were litigated in an initial-review collateral proceeding, but not preserved on appeal. *See Arnold v. Dormire*, 675 F.3d 1082, 1086-88 (8th Cir. 2012) ("The Court made clear that the holding in *Martinez*

43

did not 'concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings . . . .'") (citing and quoting *Martinez*, 1 U.S. at 16). With regard to the third allegation, which was not specifically raised in the amended postconviction motion, Henderson fails to show that the claim is "substantial." Henderson does not explain on what grounds trial counsel should have moved to strike Sarka's testimony. Moreover, Henderson fails to show that, but for trial counsel's failure to move to strike Sarka's testimony, the result of the proceeding would reasonably likely have been different. The other evidence, including "Henderson's presence at the scene, his possession of the weapons used in the shooting, the blood matching the DNA profile of one of the victims on his clothing, and the evidence of his pre-meditative intent to retaliate against someone he believed to be present at the scene," was "highly suggestive of his guilt" and supports his convictions. (Filing No. 14-2 at CM/ECF p. 8.) Because this claim is lacking merit, *Martinez* does not apply to excuse its procedural default.

Accordingly, Henderson is not entitled to habeas relief on Claim One, Subpart (6).

## B. Claim Two

Claim Two consists of multiple allegations of ineffective assistance of trial and appellate counsel.

### 1. Subpart (1)

Henderson alleges that he was denied effective assistance of counsel because trial and appellate counsel failed to argue *State v. Tompkins*, which is based on *United States v. Hahn*, 922 F.2d 243 (5th Cir. 1991), in response to the State raising the good faith exception to the exclusionary rule for the first time on appeal. (Filing No. 1 at CM/ECF pp. 24–25.)

As an initial matter, this claim is restricted to the actions of Henderson's counsel on appeal because the alleged ineffective performance could not have occurred until direct appeal. Henderson raised the ineffective assistance of appellate counsel allegation in his amended postconviction motion and subsequent appeal. The Nebraska Supreme Court considered and rejected the claim as follows:

> Finally, Henderson alleges that his appellate counsel was ineffective for not arguing that our opinion in *State v. Tompkins*, 272 Neb. 547, 723 N.W.2d 344 (2006), *modified on denial of rehearing* 272 Neb. 865, 727 N.W.2d 423 (2007), precluded us from finding, as argued by the State on direct appeal, that text messages from the cell phone found on Henderson were admissible under the good faith exception to the exclusionary rule. Henderson contends that the State did not raise the good faith exception at trial and that as a result, *Tompkins* precluded the State from raising it on appeal.

> It is not entirely clear that the State did not raise the good faith exception to the trial court in some fashion. Although the State cannot point to any indication in the record that it did, we note that the record does show that Henderson's counsel argued at trial that the good faith exception did not apply. At the very least, then, Henderson's counsel was aware of the potential applicability of the exception and took the opportunity to argue against it.

> In any event, we do not need to determine whether the State actually raised the good faith exception in the trial court in order to resolve this assignment of error. In *State v. Tompkins, supra*, the sole issue on appeal was whether an appellate court may consider the good faith exception sua sponte. We concluded that it may not, reasoning that if the court finds the exception applies on the court's own initiative, the defendant is given no chance to make arguments to the contrary. *Tompkins* thus does not answer the question of whether the State may raise the good faith exception for the first time on appeal.

> In *Tompkins*, we did cite *U.S. v. Hahn*, 922 F.2d 243 (5th Cir. 1991), a case in which a federal appellate court declined to apply the exception because the prosecution had not raised the issue before the trial court. Henderson seems to contend that if his appellate counsel had cited *Tompkins*, we would have, in reliance on *Hahn*, extended *Tompkins* to

45

say that we could not consider the good faith exception because it was not raised at trial. But in fact, *Hahn* itself did not categorically hold that the prosecution could never raise the good faith exception for the first time on appeal. Rather, the court pointed out that the defendant had "not had a fair opportunity to factually respond" to the assertion of the good faith exception, and because of that and other reasons unique to that case, "considerations of fairness and the orderly administration of justice tip[ped] the scales in favor" of not considering the good faith exception. *U.S. v. Hahn*, 922 F.2d at 248.

In this case, Henderson cannot claim that he did not have an opportunity to factually address the potential applicability of the good faith exception. As noted above, his counsel expressly argued at trial that the exception did not apply. Thus, even assuming for the sake of argument that we could have been convinced to follow *Hahn*, it would not have precluded our consideration of the good faith exception in Henderson's direct appeal. Because the result of Henderson's direct appeal would have been no different had his counsel cited *Tompkins*, we find no merit to this assignment of error.

(Filing No. 14-2 at CM/ECF pp. 17-18.)

The Nebraska Supreme Court determined, based on *Strickland*, that Henderson was not prejudiced by appellate counsel's failure to cite *Tompkins* on direct appeal. In reaching this conclusion, the Nebraska Supreme analyzed *Tompkins* and *Hahn* and determined that neither case would have precluded the court from considering the good faith exception on direct appeal, and thus, the result of the direct appeal would not have been different had appellate counsel cited *Tompkins*. Henderson has not established that the Nebraska Supreme Court's decision on this issue was based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, Henderson is not entitled to relief on this claim.

## 2.  Subpart (2)

Henderson next claims that he was denied effective assistance of counsel because trial and appellate counsel failed to assign error to the trial court's refusal to give a limiting instruction regarding the cell phone text messages. ([Filing No. 1 at CM/ECF p. 28](#).)

Like Subpart (1), this claim is limited to Henderson's counsel's performance on direct appeal, not at trial. Henderson raised the ineffective assistance of appellate counsel allegation in his amended postconviction motion and subsequent appeal. The Nebraska Supreme Court considered and rejected the claim as follows:

> At trial, Henderson's counsel proposed the following instruction regarding the text messages:
>
> > During this trial the Court admitted some evidence that was received for a specific limited purpose. Specifically, the incoming text messages received into evidence from the cell phone of [Henderson were] offered to show [Henderson's] state of mind. The content of the text messages was not received for the purpose of showing the truth of the matter asserted in the incoming text messages. You may consider the evidence only for the limited purpose for which it was received and for no other purpose.
>
> The trial court declined to give this instruction. On direct appeal, we determined that the text messages were admitted not for the truth of the statements contained therein but instead for the purpose of showing their effect on Henderson and were thus not hearsay. We did not address the limiting instruction because Henderson's appellate counsel did not properly raise the issue on direct appeal. Henderson alleged in his postconviction motion that his appellate counsel was deficient in failing to do so and now alleges on appeal that the district court erred in denying him an evidentiary hearing to address the issue.

We conclude that Henderson was not entitled to an evidentiary hearing on this matter. Even if Henderson's appellate counsel had raised the limiting instruction on appeal, it would not have been grounds for a reversal of his convictions. We perceive little danger that the jury improperly deliberated by considering the text messages for the truth of the matter asserted. The facts asserted in the messages were that an individual had stabbed "Jb" and that the individual was in the same area as the author of the text messages. Whether those facts were true was immaterial. Regardless of whether "Jb" had actually been stabbed, whether the suspected individual had done it, or whether that person was in the area described, the text messages would have suggested that Henderson went to the area of the shootings with the intent of retaliating against the individual who he believed stabbed his acquaintance. And this was the nonhearsay purpose for which they were admitted. No limiting instruction was necessary to prevent the jury from considering the truth of the statements in the text messages.

(Filing No. 14-2 at CM/ECF pp. 13-14.)

The court must grant substantial deference to the Nebraska Supreme Court's decision on this issue. The Nebraska Supreme Court reviewed the text messages and determined, based on *Strickland*, that Henderson was not prejudiced by counsel's failure to assign and argue on direct appeal the trial court's error in refusing to give a limiting instruction regarding the cell phone text messages. Henderson has not established that the Nebraska Supreme Court's decision on this issue was based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, Claim Two, Subpart (2), is denied.

### 3.  Subpart (3)

Henderson asserts that he was denied effective assistance of counsel because trial and appellate counsel failed to object or assign error to photos of an individual

believed to be Jimmy Levering flashing gang signs being shown to the jury. (Filing No. 1 at CM/ECF pp. 30–31.)

Henderson did not raise the ineffective assistance of appellate counsel claim in his amended postconviction motion. (Filing No. 14-17 at CM/ECF pp. 34-35.) Thus, this claim is now procedurally defaulted, not unexhausted, because Nebraska courts would not consider a successive postconviction motion on that claim. *See Sims*, 761 N.W.2d at 533; *Ortiz*, 670 N.W.2d at 792. Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations. Henderson has not demonstrated cause or prejudice for the default. Henderson cannot rely on *Martinez* to excuse the procedural default because *Martinez* does not apply to defaulted ineffective assistance of appellate counsel claims. *Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017); *Dansby v. Hobbs*, 766 F.3d 809, 833 (8th Cir. 2014). Moreover, as discussed below, Henderson has not shown that he is actually (meaning factually) innocent or that some miscarriage of justice took place. The court has carefully examined the record; the evidence was sufficient to convict Henderson beyond a reasonable doubt.

Henderson did raise the ineffective assistance of trial counsel allegation in his amended postconviction motion and subsequent appeal. The Nebraska Supreme Court considered and rejected the claim as follows:

> Henderson also contends his trial counsel was deficient for not objecting to the admission of pictures of Levering as unfairly prejudicial. According to Henderson, Levering is making gang-related hand gestures in the pictures. However, there was no testimony that Levering's hand gestures were gang related. Furthermore, on direct appeal, we did not consider the photograph itself to be evidence of gang affiliation; we determined that other than the "'infamous gang member'" reference, "the State did not present . . . evidence of gang affiliations." *Id.* at 298, 299, 854 N.W.2d at 638, 639. Having already decided that the photograph of Levering does not constitute evidence of gang affiliation, we will not revisit the issue on postconviction review. See *State v. Thorpe*, 290 Neb. 149, 156, 858 N.W.2d 880, 887 (2015) ("[a] motion for postconviction relief cannot be used to secure

review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased").

(Filing No. 14-2 at CM/ECF pp. 12-13.)

Without additional testimony, it is pure speculation that Levering's hand gestures in the photographs are gang related. (*See* Filing No. 14-20 at CM/ECF pp. 85-88; Filing No. 14-23 at CM/ECF pp. 56-57.) Relying on its decision on direct appeal that the photograph of Levering did not constitute evidence of gang affiliation, the Nebraska Supreme Court rejected Henderson's ineffective assistance of counsel claim. Henderson has not established that the Nebraska Supreme Court's resolution of this claim was based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.[9] Accordingly, Henderson is not entitled to habeas relief on Claim Two, Subpart (3).

## 4. Subpart (4)

Henderson alleges that he was denied effective assistance of counsel because trial and appellate counsel failed to object or assign error to the State showing the jury a photo of a coat worn by Henderson the night of his arrest and saying the coat had bloodstains on it. (Filing No. 1 at CM/ECF pp. 60–61.)

---

[9] Henderson contends in his response brief that the Nebraska Supreme Court's decision was contrary to *Dawson v. Delaware*, 503 U.S. 159 (1992). (Filing No. 21 at CM/ECF pp. 37-38.) In *Dawson*, the United States Supreme Court held that "[a] defendant's membership in a gang cannot be raised as bad character evidence in the penalty phase of a capital proceeding when the evidence is not relevant to the rebuttal of any specific mitigating evidence. 503 U.S. at 165-69. It is unclear how *Dawson* is applicable here. The Nebraska Supreme Court determined that the photograph of Levering did not constitute evidence of gang affiliation. Nor was this evidence introduced in the penalty phase of a capital proceeding.

Henderson raised both ineffective assistance of counsel claims in his amended postconviction motion (filing no. 14-17 at CM/ECF p. 14), but he did not raise the ineffective assistance of appellate counsel claim on postconviction appeal. As a result, Henderson has not invoked one complete round of Nebraska's established appellate review process as it relates to that claim. The claim is now procedurally defaulted, not unexhausted, because the Nebraska courts would not entertain a successive postconviction motion based on that claim. Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations. Henderson cannot rely on *Martinez* to excuse the procedural default because *Martinez* does not apply to defaulted ineffective assistance of appellate counsel claims. *Davila*, 137 S. Ct. at 2063; *Dansby*, 766 F.3d at 833. Moreover, as discussed below, Henderson has not shown that he is actually (meaning factually) innocent or that some miscarriage of justice took place. The court has carefully examined the record; the evidence was sufficient to convict Henderson beyond a reasonable doubt.

Henderson did raise the ineffective assistance of trial counsel claim on postconviction appeal, and the Nebraska Supreme Court resolved the claim on the merits. The court wrote:

> Photographs of a coat were received at trial without objection. Testimony at trial established that the coat in the photographs was the Carhartt jacket worn by Henderson when police apprehended him. The detective who identified the photographs testified without objection that the coat had blood on it. DNA testing was not performed on this blood, but as noted above, DNA testing showed that Voss' blood was on Henderson's shirt and shoes.

> Henderson asserts his counsel was deficient in failing to make authentication or prejudice objections to the admission of photographs of the coat. He noted that no evidence was presented that the blood on the coat was ever tested and matched to either victim. Henderson claimed that allowing the jury to see photographs of "an untested and supposedly blood-stained article of clothing" denied him a fair trial.

We fail to see how testimony that there was blood on Henderson's jacket prejudiced Henderson's defense. Henderson conceded that he was at the scene of the shootings. In addition, Voss' blood was found on Henderson's shirt and shoes. Given evidence that Henderson was not only present at the scene but also sufficiently close to Voss to get Voss' blood on his clothing, we do not believe additional testimony suggesting there was blood on his coat "altered the evidentiary picture." See *State v. Newman*, 300 Neb. 770, 783, 916 N.W.2d 393, 407 (2018). Accordingly, the district court did not err by denying this claim without an evidentiary hearing.

(Filing No. 14-2 at CM/ECF p. 16.)

The court finds that the Nebraska Supreme Court reasonably applied *Strickland* in concluding that Henderson had not demonstrated prejudice from trial counsel's failure to object to the admission of photographs of the coat and the State commenting that the coat had bloodstains on it. Thus, applying the deferential standards required by both *Strickland* and 28 U.S.C. § 2254(d), the court finds that the Nebraska Supreme Court's ruling on this issue was not based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, Henderson is not entitled to habeas relief on Claim Two, Subpart (4).

### 5. Subpart (5)

Henderson next argues that he was denied effective assistance of counsel because trial and appellate counsel failed to request an attempted manslaughter instruction or assign error to the instruction not being given. (Filing No. 1 at CM/ECF pp. 64–65.)

Henderson raised both ineffective assistance of counsel claims in his amended postconviction motion (filing no. 14-17 at CM/ECF p. 13), but he did not raise the ineffective assistance of appellate counsel claim on postconviction appeal. As a result, Henderson has not invoked one complete round of Nebraska's established

52

appellate review process as it relates to that claim. The claim is now procedurally defaulted, not unexhausted, because the Nebraska courts would not entertain a successive postconviction motion based on that claim. Furthermore, any successive postconviction motion filed by Henderson would also be barred by Nebraska's statute of limitations. Henderson cannot rely on *Martinez* to excuse the procedural default because *Martinez* does not apply to defaulted ineffective assistance of appellate counsel claims. *Davila*, 137 S. Ct. at 2063; *Dansby*, 766 F.3d at 833. Moreover, as discussed below, Henderson has not shown that he is actually (meaning factually) innocent or that some miscarriage of justice took place. The court has carefully examined the record; the evidence was sufficient to convict Henderson beyond a reasonable doubt.

Henderson did raise the ineffective assistance of trial counsel claim on postconviction appeal, and the Nebraska Supreme Court resolved the claim as follows:

> Henderson was charged and convicted of the attempted first degree murder of Antonio Washington. He claims his trial counsel was ineffective in not requesting lesser-included offense instructions on that charge. But, in fact, the trial court did instruct the jury on the elements of second degree murder and informed the jury that it could find Henderson guilty of first degree murder or second degree murder or find him not guilty. Furthermore, Henderson did not identify any other lesser-included offenses in his postconviction motion or explain why the result of the proceeding would have been different had the jury been instructed on those offenses. Because Henderson's allegations were not sufficiently specific for the district court to make a determination as to whether an evidentiary hearing was required, the district court did not err in denying Henderson's claim without an evidentiary hearing. See *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018).

(Filing No. 14-2 at CM/ECF p. 16.)

Henderson argues that the Nebraska Supreme Court erred when it found that "he did not identify any other lesser included offense[s]." (Filing No. 21 at CM/ECF

p. 40.) He then states that in his "brief to the courts, [he] asserted he was entitled to the lesser-included offense of attempted manslaughter." (*Id.*) Henderson misconstrues the Nebraska Supreme Court's finding, which was that he failed to identify any lesser included offense in his *postconviction motion*; the court was not referring to Henderson's brief on postconviction appeal. The state district court, applying the *Strickland* standard, concluded that "the fact that the jury convicted [Henderson] of Attempted Murder [in the first degree] establishes the jury would not have moved to a lesser included offense and therefore, [Henderson] did not suffer any prejudice." (Filing No. 14-17 at CM/ECF p. 74.) *Cf. State v. Alarcon-Chavez, 821 N.W.2d 359, 368-69 (Neb. 2012)* (when a jury is instructed on first and second degree murder and the defendant is found guilty of first degree murder, any error in the instruction for manslaughter or any improper failure to instruct the jury on manslaughter does not require reversal). Henderson has not established that the Nebraska state courts' decisions were based on unreasonable determinations of the facts in light of the evidence or that they were contrary to, or involved unreasonable applications of, clearly established federal law as determined by the United States Supreme Court. Accordingly, Claim Two, Subpart (5), is denied.

## C.  Claim Three

In Claim Three, Henderson asserts that he was denied a fair trial due to prosecutorial misconduct, omission of jury instructions, and improper admission of evidence.

The court will briefly discuss the relevant federal law so that it may apply it later in a summary fashion as it reviews Henderson's claims.

First, a habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 171 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient

significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 485 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667 (1985)). "Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different." *Kellogg v. Skon*, 176 F.3d 447, 451 (8th Cir. 1999).

Second, jury instructions generally do not form a basis for habeas corpus relief. *Williams v. Lockhart*, 736 F.2d 1264, 1267 (8th Cir. 1984); *Dietz v. Solem*, 640 F.2d 126, 130 (8th Cir. 1981); *Brouillette v. Wood*, 636 F.2d 215, 218 (8th Cir. 1980), *cert. denied*, 450 U.S. 1044 (1981). Habeas relief is available when a petitioner establishes that improper instructions resulted in a "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *Brouillette*, 636 F.2d at 218 (citing *DeBerry v. Wolff*, 513 F.2d 1336, 1338-39 (8th Cir. 1975) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)); *accord Williams*, 736 F.2d at 1267. "The burden of demonstrating that errors in jury instructions were sufficiently prejudicial to 'support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.'" *Williams*, 736 F.2d at 1267 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). A petitioner must show that the alleged error so infected the entire trial that he was deprived of his right to due process. *Cupp v. Naughton*, 414 U.S. 141, 147 (1973); *Williams*, 736 F.2d at 1267.

Finally, a state court's evidentiary rulings can form the basis for federal habeas relief under the Due Process Clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process. *Parker v. Bowersox*, 94 F.3d 458, 460 (8th Cir. 1996) (citing *Troupe v. Groose*, 72 F.3d 75, 76 (8th Cir. 1995); *Bennett v. Lockhart*, 39 F.3d 848, 856 (8th Cir. 1994)).

55

### 1. Subpart (1)

Henderson asserts that he was denied his constitutional right to a fair trial because the State committed prosecutorial misconduct by using the 'J-town' text messages for the truth of the matter asserted, after claiming they were being submitted as a statement of a co-conspirator or for other non-hearsay purposes. (Filing No. 1 at CM/ECF pp. 26–27.)

Although Henderson raised this claim in his amended postconviction motion (filing no. 14-17 at CM/ECF pp. 17-18), he was required to raise the claim on direct appeal but did not do so.[10] Thus, Claim Three, Subpart (1), is procedurally defaulted.

Alternatively, the court finds that Claim Three, Subpart (1), fails on the merits. As discussed in Claim One, Subpart (4), the Nebraska Supreme Court concluded on direct appeal that the text messages "were not admitted for the truth of the statements contained therein but instead for the purpose of showing their effect on Henderson." (Filing No. 14-1 at CM/ECF p. 17; *see also* Claim One, Subpart (4), *supra*.) Because the text messages were in fact admitted and used for non-hearsay purposes, it is inconsequential whether the State argued that the text messages were also admissible under alternative grounds. Furthermore, on postconviction appeal, the Nebraska Supreme Court "perceive[d] little danger that the jury improperly deliberated by considering the text messages for the truth of the matter asserted." (Filing No. 14-2 at CM/ECF p. 14.) The court explained:

> The facts asserted in the messages were that an individual had stabbed "Jb" and that the individual was in the same area as the author of the text messages. Whether those facts were true was immaterial. Regardless of whether "Jb" had actually been stabbed, whether the

---

[10] The state district court concluded that the claim was procedurally barred because it could have been raised on direct appeal. (Filing No. 14-17 at CM/ECF p. 75.) Unsurprisingly, Henderson did not raise this claim in his postconviction appeal before the Nebraska Supreme Court.

suspected individual had done it, or whether that person was in the area described, the text messages would have suggested that Henderson went to the area of the shootings with the intent of retaliating against the individual who he believed stabbed his acquaintance. And this was the nonhearsay purpose for which they were admitted.

(*Id.*) Henderson had not established that the Nebraska Supreme Court's decision on this issue was based on an unreasonable determination of the facts in light of the evidence, or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

Furthermore, when the court weighs the effect of the State's alleged misconduct, the court finds that there is not a reasonable probability that it affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different. *See Kellogg*, 176 F.3d at 451. As the Nebraska Supreme Court observed on postconviction appeal, "Henderson's presence at the scene, his possession of the weapons used in the shooting, the blood matching the DNA profile of one of the victims on his clothing, and the evidence of his pre-meditative intent to retaliate against someone he believed to be present at the scene are highly suggestive of his guilt." (Filing No. 14-2 at CM/ECF p. 8.) Thus, the court finds that any alleged prosecutorial misconduct in using the 'J-town' text messages for the truth of the matter asserted did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. *See Darden*, 477 U.S. at 171. Accordingly, Claim Three, Subpart (1), is denied.

## 2. Subpart (2)

Next, Henderson alleges that he was denied his constitutional right to a fair trial because the trial court refused to give a limiting instruction regarding the cell phone text messages. (Filing No. 1 at CM/ECF p. 29.)

The Nebraska Supreme Court declined to consider this argument on direct appeal "because Henderson did not assign error to the court's rejection of the instruction." (Filing No. 14-1 at CM/ECF p. 18 (citing *State v. Duncan*, 775 N.W.2d

922 (Neb. 2009) (the court does not consider errors which are argued but not assigned).) The Nebraska Supreme Court's denial of this claim was based on an independent and adequate state procedural rule. *See Duncan*, 775 N.W.2d 922. Therefore, Claim Three, Subpart (2), is now procedurally defaulted.

Alternatively, the court finds that Claim Three, Subpart (2), is without merit. As previously discussed, the Nebraska Supreme Court determined—in different contexts—that the text messages were not hearsay (filing no. 14-1 at CM/ECF pp. 17-18), and that there was "little danger that the jury improperly deliberated by considering the text messages for the truth of the matter asserted," and thus, "[n]o limiting instruction was necessary to prevent the jury from considering the truth of the statements in the text messages" (filing no. 14-2 at CM/ECF p. 14). Accordingly, Henderson cannot demonstrate that the trial court's failure to give Henderson's proposed limiting instruction so infected the entire trial that he was deprived of his right to due process. *See Cupp*, 414 U.S. at 147; *Williams*, 736 F.2d at 1267. Thus, Henderson is not entitled to habeas relief on Claim Three, Subpart (2).

### 3.  Subpart (3)

Henderson also argues that he was denied his constitutional right to a fair trial because the trial court denied his motion for a mistrial after Detective Nick Herfordt identified a photo found on the cellular phone in Henderson's possession at the time of his arrest as Jimmy Levering "an infamous gang member." (Filing No. 1 at CM/ECF pp. 34–36.)

On direct appeal, the Nebraska Supreme Court considered and rejected this claim as follows:

> Henderson next claims that the district court erred when it overruled his motion for a mistrial based on Herfordt's comment that Levering was "an infamous gang member." We conclude that the district court did not abuse its discretion when it overruled the motion for a mistrial.

A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Green*, 287 Neb. 212, 842 N.W.2d 74 (2014). A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial. *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013). Instead, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id.*

When the State questioned Herfordt regarding what he found in his search of the cell phone, Herfordt testified that the background picture that came up on the screen when the cell phone was turned on "was that of someone known to be Jimmy Levering." Henderson objected based on foundation, and the court sustained the objection. The State then attempted to provide foundation by asking Herfordt how he knew the identity of the person in the picture. Herfordt replied, "I worked Northeast Omaha when I was in uniform, and Jimmy Levering, I guess, was kind of an infamous gang member. . . ." Henderson immediately moved for a mistrial based on Herfordt's reference to gang affiliations, noting that the State had agreed in connection with Henderson's pretrial motion in limine that it would not introduce evidence regarding gang affiliations. The court overruled the motion for a mistrial. In challenging this ruling on appeal, Henderson reasserts contentions he made at trial and also offers some additional arguments.

Henderson contends that the reference to Levering as "an infamous gang member" was a violation of the order on the motion in limine precluding evidence of gang affiliation, that the motion for a mistrial should have been granted, and that the damaging effect could not be removed by admonition to the jury. With regard to Henderson's argument that the damaging effect of the reference could not be removed by admonition to the jury, the record shows that the court overruled Henderson's motion for a mistrial and the State resumed questioning Herfordt. Henderson did not ask the court for an admonition, and furthermore, the court asked Henderson whether he was moving to strike Herfordt's last answer, which contained the gang reference to which Henderson replied, "Not at this time, Judge, no." We

59

believe that any damage caused by the lack of an admonition was the result of Henderson's failure to request such admonition.

It appears from the record that the State was not expecting Herfordt to make the gang reference in his answer and that the questioning by the State was not directed at eliciting such response. The comment does not appear to be the result of intentional misconduct by the prosecution. Upon resuming questioning of Herfordt, the State cautioned Herfordt to avoid testifying about his knowledge of any affiliations the person in the picture may have had. Herfordt's gang reference was an isolated comment, the State did not present other evidence of gang affiliations, and the State did not offer evidence that Henderson had a gang affiliation.

We conclude that the court did not abuse its discretion when it overruled the motion for a mistrial, and we reject this assignment of error.

(Filing No. 14-1 at CM/ECF pp. 19-20.)

The court finds that Herfordt's statement that Levering was "kind of an infamous gang member" was not of such magnitude as to support a due process claim. As the Nebraska Supreme Court noted, the gang reference was an isolated comment concerning Herfordt's knowledge about Levering, not Henderson, from seven years earlier; the State cautioned Herfordt to avoid testifying about his knowledge of any gang affiliations Levering may have had; and there was no evidence that the shooting leading to Henderson's convictions was gang related. (Filing No. 14-20 at CM/ECF pp. 31-32, 81-82.) Moreover, in light of the "highly suggestive" evidence of his guilt, including Henderson's presence at the scene, his possession of the weapons used in the shooting, the blood matching the DNA profile of one of the victims on his clothing, and the evidence of his pre-meditative intent to retaliate against someone he believed to be present at the scene, (filing no. 14-2 at CM/ECF p. 8), the testimony that Levering was "kind of an infamous gang member" was not sufficiently prejudicial to fatally infect the trial. Henderson has not established that the Nebraska Supreme Court's conclusion was contrary to, or

60

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that its decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Thus, Claim Three, Subpart (3), is denied.

### 4.  Subparts (4), (5), and (6)

In three related claims, Henderson alleges that he was denied his constitutional right to a fair trial because the trial court erred in admitting the cell phone text messages because such evidence was inadmissible hearsay (Subpart 4) (filing no. 1 at CM/ECF at pp. 39–40), erred in admitting the cell phone text messages as statements of a co-conspirator (Subpart 5) (*id*. at CM/ECF pp. 43–44), and failed to instruct the jury on a co-conspirator rule and its application to hearsay exceptions (Subpart 6) (*id*. at CM/ECF p. 44).

As repeatedly set forth above, the Nebraska Supreme Court concluded on direct appeal that the text messages "were not admitted for the truth of the statements contained therein but instead for the purpose of showing their effect on Henderson," and therefore, the trial court did not err when it admitted the evidence over Henderson's hearsay objection. (Filing No. 14-1 at CM/ECF pp. 17-18.) The court explained:

> The State used the messages to show that Henderson believed that an individual who was responsible for an attack on an acquaintance of his was at the location where the shootings would eventually occur and that Henderson coordinated with other individuals to go to that place in order to retaliate. The messages were not used to establish that the individual was at that location or that the individual had attacked Henderson's acquaintance. Instead, the messages were offered to support the State's theory that Henderson went to the location for the purpose of retaliating against the person who assaulted his acquaintance, which was relevant to the premeditation element of first degree murder. We therefore conclude that because the evidence was not hearsay, the district court did not err when it admitted the evidence over Henderson's hearsay objection.

61

(*Id.* at CM/ECF pp. 17-18.)

Henderson has not established that the Nebraska Supreme Court's decision on this issue was based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. In light of the Nebraska Supreme Court's determination that the text messages were not admitted for hearsay purposes, whether they also were admissible as an exception to the hearsay rule as statements of a co-conspirator was immaterial. Indeed, because the Nebraska Supreme Court determined that the text messages were not hearsay and were properly admitted to show their effect on Henderson, the Nebraska Supreme Court did not consider whether the evidence would have met an exception to the hearsay rule as statements of co-conspirators. (*Id.* at CM/ECF p. 18.) There was no basis to instruct the jury on a co-conspirator rule and its application to hearsay exceptions. Accordingly, Henderson's due process claims in Claim Three, Subparts (4), (5), and (6), are without merit.

### D.  Fundamental Miscarriage of Justice

Finally, Henderson has failed to excuse his defaulted claims by showing that there would be a fundamental miscarriage of justice if the court does not consider those defaulted claims which the court has not addressed on the merits.

To establish a fundamental miscarriage of justice, a petitioner must "show, based on new evidence, that a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995) (quoting *Schlup*, 513 U.S. at 327). To obtain review of an otherwise procedurally barred claim based on actual innocence, a petitioner must satisfy a two-part test: (1) the "allegations of constitutional error must be supported with new reliable evidence not available at trial"; and (2) "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Nash v. Russell*, 807 F.3d 892, 899 (8th Cir. 2015) (citing *Schlup*, 513 U.S. at 327-28); *accord Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001). Actual innocence means factual innocence, not legal

innocence or legal insufficiency. *Narcisse v. Dahm*, 9 F.3d 38, 40 (8th Cir. 1993). The Eighth Circuit has determined that the actual innocence "standard is strict; [and] a party generally cannot demonstrate actual innocence where there is sufficient evidence to support a conviction." *Wadlington v. United States*, 428 F.3d 779, 783 (8th Cir. 2005).

Henderson has presented no new, reliable evidence of actual innocence in this case. He provides no "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Schlup*, 513 U.S. at 324, to demonstrate his claim's credibility. The court has carefully examined the record; the evidence was sufficient to convict Henderson beyond a reasonable doubt. Thus, the court finds Henderson has not satisfied the requisite elements to excuse his procedurally defaulted claims through any "gateway" claim of actual innocence.

## V.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Henderson is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the Petition for Writ of Habeas Corpus (filing no. 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 6th day of July, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge